# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| EDUARDO SHANE LUIS MALAVÉ, *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> KIMBERLY WEIR, *et al.*, <br> *Defendants*. | No. 3:16-cv-00009 (JAM) |

## RULING GRANTING MOTION FOR SUMMARY JUDGMENT

One day in August 2015, plaintiff Jacquelynn Grunert visited her husband, plaintiff Eduardo Malavé, at the Carl Robinson Correctional Institution in Connecticut where he was a sentenced prisoner. One of the guards at the prison believed that Grunert was smuggling drugs into the prison to Malavé. What followed was a succession of further investigation and other measures by prison officials that included the suspension for several months of in-person visits and telephone calls between Malavé and Grunert.

Malavé and Grunert have filed this lawsuit against several prison officials claiming that the restrictions on their visits and telephone communication was a violation of their First Amendment right of association, the Due Process Clause, and the Eighth Amendment. Defendants have now moved for summary judgment. I will grant defendants' motion for summary judgment on grounds of qualified immunity. I conclude that neither of the plaintiffs had a clearly established constitutional right that prevented prison officials from suspending their in-person visitation and telephone communications.

## BACKGROUND

Plaintiffs Eduardo Malavé and Jacquelynn Grunert are husband and wife. They have filed this lawsuit against several correctional officials who worked at the Carl Robinson Correctional

1

Institution, including Warden Kimberly Weir, Deputy Warden Yadira Otero-Negron, Deputy Warden Paul Ouellette, Captain Marc Garjuilo, and Lieutenant Nathan Alexander. The following facts are set forth in the light most favorable to plaintiffs.

In August 2015, Lt. Alexander allegedly received reports from two inmate sources of information that Malavé was the primary supplier of drugs for the prison, that he used Grunert to smuggle the drugs into the prison, and that he would soon be receiving a large shipment of drugs. Doc. #77-6 at 2; Doc. #88 at 2-4 (plaintiffs' admissions that Lt. Alexander received reports from inmate sources but questioning their reliability). Malavé had two prior disciplinary reports for possession of contraband. Doc. #88 at 5.

On August 25, 2015, Grunert visited Malavé at the prison. *Ibid*. After the visit, Malavé returned to his housing unit, and at this point Lt. Alexander states that he watched Malavé on surveillance video and saw him take a large drink of water and then lean over as if attempting to regurgitate something. Lt. Alexander claimed that this activity suggested that Grunert had passed Malavé drugs during a kiss, which Malavé was now trying to retrieve from his body. *Ibid*. Malavé and Grunert deny that they were smuggling any drugs and claim that Lt. Alexander fabricated his claim to have seen Malavé on video surveillance engaging in suspicious activity. Doc. #88-1 at 2.

On the next day after Grunert's visit, Lt. Alexander organized a search of Malavé's housing unit with the help of a trained canine to detect any contraband. Although this search did not turn up any drugs, it revealed other contraband including a needle, a homemade pipe, and pornographic pictures.

Lt. Alexander stated in his report that the dog "signaled" several times in the vicinity of Malavé's bunk bed and that this indicated that drugs had been present at some point. The officer

who conducted the canine search, Jaime Rivera, testified in his deposition that the dog only signaled once. Doc. #77-16 at 23. He also stated that his dog was "cross-trained" to detect both drugs and cell phones, that Lt. Alexander and all other relevant prison officials knew this, and that he himself never indicated that the result of the canine search necessarily indicated that drugs had been present. *Id*. at 12, 24–25. Defendants all deny that they knew the dog was cross-trained and thought that any alert by the dog was an alert to drugs. Doc. #77-12 at 52; Doc. #77-5 at 56.

Lt. Alexander reported that the canine search had confirmed his informants' tip. He recommended that the intelligence unit investigate Grunert for her role in the scheme, and that she ultimately be removed from Malavé's visiting list. Captain Gargiulo seems to have forwarded this report to Warden Weir. The Warden then removed Grunert from Malavé's visiting list, as Lt. Alexander had suggested, and prohibited him from any telephone contact with her as well. Doc. #88 at 9. She did not prohibit Malavé from corresponding with Grunert via mail, but this mail correspondence was subject to a two-week screening delay at the prison. *Id*. at 9 (¶ 23); Doc. #77-4 at 47.

Lt. Alexander also issued Malavé three Class A disciplinary tickets in the wake of the search: for possession of drug paraphernalia (the needle and pipe), possession of sexually explicit material, and "self-mutilation" (*i.e.*, getting tattoos while in prison). Malavé pleaded guilty to these tickets, and he says he did so because he was told if he did not he would "sit in seg for the maximum" and that he "had to sign it." Doc. #88 at 13. For these tickets he received a total of 21 days punitive segregation, 60 days loss of visiting privileges, 60 days loss of telephone privileges, 30 days loss of commissary privileges, and 30 days loss of good time credits. He was also placed on "no-contact" status for his visits for a year. *Id*. at 14–15. Malavé submitted a

3

grievance on October 1, 2015, which was denied by Deputy Warden Ouellette on October 19, 2015. *Id*. at 16.

All in all, as a result of the allegations that plaintiffs were smuggling contraband into the prison (and apart from the separate disciplinary restrictions imposed by the finding of contraband to which Malavé pleaded guilty), plaintiffs were denied the right to speak by telephone for several months from December 2015 or January 2016 to late March 2016, and they were barred from in-person, non-contact visits for more than five months from mid-November 2015 until at least late May or as late as August 2016. Doc. #88 at 18-19.

Defendants now move for summary judgment. They argue in part that Malavé did not fully exhaust his claims and that they are entitled to qualified immunity, because they did not violate any clearly established rights of plaintiffs to visit or speak by telephone with one another.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

*Exhaustion of Administrative Remedies*

Defendants argue that Malavé failed to exhaust his administrative remedies as to his claim for the deprivation of his telephone privileges to speak with his wife. The Prison Litigation Reform Act (PLRA) states that "no action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Malavé does not claim that he exhausted his remedies, but rather that he was not required to do so, essentially because he was never made aware of the order barring him from telephone contact. *See* Doc. #87 at 5–6, 9–10. Malavé claims that Weir entered orders on September 15, 2015, both removing Grunert from the visiting list and barring phone contact, but her letter to Grunert the same day only mentioned the former order. The only information Malavé ever received about this order was a conversation with Gargiulo at some point, when Gargiulo informed him he could not speak to his wife over the phone. The order was canceled on March 28, 2016. Because Malavé was never given formal notice of the telephone restrictions, Malavé argues that he could not effectively pursue administrative remedies for those restrictions, and therefore the PLRA's exhaustion requirement should not apply to him. *See Ross v. Blake*, 136 S.Ct. 1850, 1859–60 (2016) (explaining exceptions to the PLRA exhaustion requirement).

I do not find Malavé's argument convincing, because plaintiffs filed this lawsuit, on January 5, 2016, and in their complaint mentioned that Grunert had been removed from Malavé's telephone list as well as his phone list. Malavé must have been aware of the telephone restrictions at that point, and therefore was required by the PLRA to pursue internal prison remedies before filing this lawsuit. I will therefore grant summary judgment to defendants as to Malavé's claim for the deprivation of his telephone rights.

Grunert, however, is not a prisoner and is not subject to the PLRA's exhaustion requirements. *See Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999). She was able to bring her claims concerning the telephone privileges without going through any internal prison mechanism, and therefore I will not grant summary judgment on exhaustion grounds as to her claims arising from the loss of telephone contact.

*Qualified Immunity*

Not every violation of the Constitution justifies an award of money damages. That is because the doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (*per curiam*). In this manner, "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Qualified immunity protects a government official from liability if "(1) his conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529–30 (2d Cir. 2010). As the Supreme Court has explained, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Thus, an official is entitled to qualified immunity if, on the basis of the

facts known to the official when he or she engaged in the conduct at issue, "officers of reasonable competence could disagree as to the lawfulness of such conduct." *Manganiello v. City of New York*, 612 F.3d 149, 164–65 (2d Cir. 2010).

The Second Circuit has noted that "[t]o determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). The law may be clearly established if "decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Ibid.* (internal quotations omitted). Although there need not be "a case directly on point," it must nonetheless be clear that "existing precedent [has] placed the ... constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017) (denial of qualified immunity on excessive force claim was in error where court "failed to identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment," and instead relied on cases that "lay out excessive-force principles at only a general level").

In light of this legal framework that governs the application of qualified immunity, an initial and critical task for a court that is considering a qualified immunity defense is to define at the appropriate level of specificity what right is at issue in the case. It is only by properly defining the alleged right at issue that I can, in turn, draw a conclusion about whether that right was one that was clearly established, and whether it would and should have been apparent to defendants that they were violating that right. *See Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) (noting how "courts must calibrate, on a case-by-case basis, how generally or specifically to define the right at issue" for purposes of making a qualified immunity

7

determination and that a court should follow a "Goldilocks principle" that avoids defining the right too broadly or too narrowly).

Here, I will define the asserted rights at issue in light of the actual deprivation or restrictions that occurred in this case and in light of the fact that there are two plaintiffs in this case whose rights may arguably differ from one another. First, I must consider the right of the prisoner (Malavé) not to be deprived of in-person, non-contact visitation with his non-imprisoned marriage partner for as long as eight months (November 2015 to August 2016). Second, I must consider the right of the non-prisoner (Grunert) not to be deprived of in-person, non-contact visitation with her imprisoned marriage partner for as long as eight months as well as the right of the non-prisoner not to be deprived of the ability to speak by telephone with her imprisoned marriage partner for approximately four months (December 2015 to March 2016).

Defendants argue for qualified immunity on grounds that plaintiffs did not have a clearly established constitutional right to telephonic and in-person visitation. I agree with defendants for substantially the reasons set forth by the Fourth Circuit in *Williams v. Ozmint*, 716 F.3d 801 (4th Cir. 2013), a case that involved a two-year visitation ban imposed on a prisoner who was suspected of smuggling drugs into the prison facility. The Fourth Circuit dismissed the prisoner's claim on grounds of qualified immunity, noting that the prisoner "does not cite any case, or combination of cases, from this Court, the Supreme Court, or the highest court in South Carolina, that clearly establishes a constitutional right to visitation in prison grounded in the First, Eighth, or Fourteenth Amendments." *Id.* at 806.

The Fourth Circuit surveyed decisions of the U.S. Supreme Court to conclude that the Supreme Court had not yet recognized a constitutional right to prison visitation. For example, in *Overton v. Bazzetta*, 539 U.S. 126 (2003), the Supreme Court considered a constitutional

8

challenge to certain prison regulations that imposed a two-year ban on visitation for prisoners with multiple substance-abuse violations. The Supreme Court noted that "certain kinds of highly personal relationships" are protected under the Constitution, but stated that "[t]his is not an appropriate case for further elaboration of those matters." *Id.* at 131.[1] The Supreme Court further explained that "[a]n inmate does not retain rights inconsistent with proper incarceration," and "freedom of association is among the rights least compatible with incarceration." *Ibid.*

To be sure, the Court in *Overton* acknowledged that "[i]f the withdrawal of all visitation privileges were permanent or for a much longer period, or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations." *Id.* at 137. But the facts now before me do not involve a permanent or lengthier deprivation than the two years at issue in *Overton*. And to the extent that plaintiffs here claim that the visitation suspension was imposed on them by Lt. Alexander or others for arbitrary or malicious reasons, the Supreme Court in *Overton* said no more than that such facts involving an "arbitrary" deprivation would "present different considerations." This falls well short of declaring clearly established law.

Ultimately, the Supreme Court in *Overton* did not resolve whether inmates have any kind of constitutional right to visitation. Instead it merely decided that the regulation bore a rational relationship to legitimate penological interests, and that this was enough to sustain it even if inmates do retain some associational rights. *Id.* at 132. In so doing, the Supreme Court stated that "[w]e do not hold, and we do not imply, that any right to intimate association is altogether

---

[1] The Court in *Overton* did not specify what provision(s) of the Constitution protect "highly personal relationships" but cited cases rooted in the First Amendment right to association and substantive due process under the Fifth or Fourteenth Amendments. *See* 539 U.S. at 131 (citing *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), *Moore v. East Cleveland*, 431 U.S. 494 (1977) (plurality opinion), and *Meyer v. Nebraska*, 262 U.S. 390 (1923)). The plaintiffs in *Overton* raised claims under "the substantive due process mandate of the Fourteenth Amendment, [and] the First or Eighth Amendments as applicable to the States through the Fourteenth Amendment." 539 U.S. at 128. Accordingly, the constitutional claims presented in *Overton* are the same as presented by plaintiffs in this case.

terminated by incarceration or is always irrelevant to claims made by prisoners," and "[w]e need not attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration because the challenged regulations bear a rational relation to legitimate penological interests." *Id.* at 131-32.

Nor—as to plaintiff Grunert's claims—has the Supreme Court suggested that a non-imprisoned person has a constitutional right to visit persons who are imprisoned. In *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 460–61 (1989), the Court stated that it could not "seriously be contended, in light of our prior cases—that an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause," and it added that "[t]he denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence, and therefore is not independently protected by the Due Process Clause." *Id.* at 460, 461 (internal citation and quotation marks omitted).

Here, of course, plaintiffs assert a right to visitation (whether in-person or by telephone) that involves a marriage relationship. In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held that prisoners have a constitutionally protected right to marry, although "[t]he right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration." *Id.* at 95. The Court concluded that an inmate marriage regulation that prohibited inmates from marrying absent a determination by the prison superintendent that there was a compelling reason for marriage was not constitutional, because it did not relate to any reasonable penological objective.

The case now before me is not about the right to marry. The case is about the rights—if any—of married partners to in-person or telephonic visitation while one of the partners is

10

imprisoned.² The Supreme Court has not expressly recognized such a constitutional right or, at the least, that there is such a right that cannot be abridged or suspended by prison authorities for as long as the eight months that is at issue in this case.

Nor has the Second Circuit recognized a right to visitation or telephonic contact between married persons where one of the persons is in prison. In *Mills v. Fischer*, 497 Fed. App'x 114 (2d Cir. 2012), the Second Circuit considered an appeal from a district court's dismissal of a lawsuit claiming a constitutional right to visitation between a prisoner and two of his family members. Citing *Overton v. Bazzetta*, the court of appeals "assum[ed] that inmates and their families have a right to visitation protected by the First Amendment," and then further concluded that the complaint "does not state a plausible violation of that right." *Id.* at 116; *see also ibid.* ("*Assuming that prisoners have a right under the First Amendment to have family visits*, that right could not require that visits by family members be permitted on demand, but rather must be subject to reasonable restrictions on the time, place and manner of visits.") (emphasis added).

The Second Circuit's hypothetical assumption of a right does not create clearly established law. It is true that the Second Circuit went on to state that "[o]n the other hand, the intentional or malicious deprivation of visitation to a prisoner, even on one occasion, could rise to the level of a constitutional violation." *Id.* at 116. And it could be argued that—at least as to Lt. Alexander who plaintiffs allege concocted a false story against them—there was a malicious deprivation of their asserted right to telephone or visit with one another. But this statement from

---

² More precisely, because Malavé did not properly exhaust his claim for telephonic communication, the more limited issue before me as to telephonic communications is whether Grunert alone has a clearly established constitutional right to speak with her husband by telephone while he is imprisoned.

11

*Mills v. Fischer* was dicta and equivocal ("*could* rise to the level"), and it all appears in the context of an unpublished summary order.[3]

The Second Circuit's rules allow for the citation of its summary orders but provide that they shall not have precedential effect. *See* Second Circuit Local Rule 32.1.1, available at *http://www.ca2.uscourts.gov/clerk/case_filing/rules/title7/local_rule_32_1_1.html*. Although there may be reason for the courts of appeals to reconsider their practices of issuing non-precedential summary orders,[4] it would be odd in light of the Second Circuit's own disclaimer of their precedential effect to conclude that summary orders alone may constitute clearly established law for purposes of overcoming qualified immunity and imposing monetary liability on government officials. *See generally* David R. Cleveland, *Clear as Mud: How the Uncertain Precedential Status of Unpublished Opinions Muddles Qualified Immunity Determinations*, 65 U. Miami L. Rev. 45, 46, 69 (2010) (arguing that "[d]enying precedential status to unpublished opinions muddles the already unclear law surrounding qualified immunity" and that "[t]his uncertainty should be removed either by granting these opinions precedential status or by recognizing their value in the qualified immunity analysis," but that "it is likely that the Second Circuit will not look to unpublished opinions for clearly established law"); *Cerrone v. Brown*,

---

[3] Nor do the published cases that were cited by the Second Circuit by way of an indirect "*cf.*" cite signal have anything to do with prison visitation. *See id.* at 116-17 ("*Cf. Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 36–37, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (O'Connor, J., concurring) ("There are no *de minimis* violations of the Constitution—no constitutional harms so slight that the courts are obliged to ignore them."); *Shakur v. Selsky*, 391 F.3d 106, 110–20 (2d Cir. 2004) (holding that prisoner stated First Amendment claim where he alleged that corrections officer maliciously and intentionally prevented him from attending important religious feast, and rejecting argument that missing one religious feast was *de minimis*)").

[4] Some judges and commentators alike have critiqued the practice. *See, e.g.*, Richard S. Arnold, *Unpublished Opinions: A Comment*, 1 J. App. Prac. & Process 219 (1999); Erica S. Weisgerber, *Unpublished Opinions: A Convenient Means to an Unconstitutional End*, 97 Geo. L.J. 621 (2009). "The practice in most circuits of making run-of-the-mill cases 'unpublished' may also protect officers who make egregious, but ordinary, mistakes, as long as the precedential analogues are all unpublished." Linda Ross Meyer, *When Reasonable Minds Differ*, 71 N.Y.U. L. Rev. 1467, 1518 (1996).

246 F.3d 194, 202 (2d Cir. 2001) ("A district court opinion affirmed by an unpublished table decision does not determine whether a right was clearly established.").[5]

On the other hand, as Judge Kravitz has observed, "while summary orders, as non-precedential opinions, do not make law, they often do state the law," and "since summary orders are meant to be used only when the law on a given topic is settled, summary orders presumably provide particularly good evidence of what legal principles the Second Circuit considers as established at any given point in time." *Bell v. Luna*, 856 F. Supp. 2d 388, 401 n.3 (D. Conn. 2012). Fair enough. But even if I were to accept that a summary order like the one issued by the Second Circuit in *Mills v. Fischer* may create clearly established law that "counts" for qualified immunity "clearly established law" purposes, I am left with the fact that the one helpful statement for plaintiffs from *Mills v. Fischer* is both dicta and equivocal in nature, while the rest of the ruling does no more than assume that there is a constitutional right to visitation among family members.

The upshot is that the law of the Second Circuit does not recognize a clearly established right of married partners to engage in either in-person visitation or telephonic communication with one another while one of those persons is in prison. "Convicted prisoners, their family and spouses have no constitutional right to visitation," and "[f]ace to face contact with a spouse is important in a marriage, but it is not a federal constitutional right." *Young v. Vaughn*, 2000 WL 1056444, at *2 (E.D. Pa. 2000) (collecting cases); *see also Ware v. Morrison*, 276 F.3d 385, 387-88 (8th Cir. 2002) (no due process right to prison visitation with spouse).

---

[5] Not all circuits have taken a clear position on whether unpublished opinions may play a role in the determination of clearly established law. The Fourth Circuit has rejected the use of unpublished opinions for qualified immunity purposes. *See Booker v. South Carolina Dep't of Corrections*, 855 F.3d 533, 543 (4th Cir. 2017). By contrast, the Ninth Circuit seems to take a broad approach to determining what counts as "clearly established law" to include summary orders as well as ruling from other circuits and district courts. *See Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005).

Plaintiffs' due process claim fails for another reason: that Connecticut prison regulations do not create a liberty interest in prison visitation. A protected liberty interest would come into existence only if "state law makes it clear that prison officials have no authority to deny visits." *Graziani v. Murphy*, 2012 WL 2785907, at *3 (D. Conn. 2012). But the Connecticut prison regulation states that "an application for visitation shall *normally* be approved, unless there is a reasonable belief that such authorization may jeopardize safety or security." Doc. #88-3 at 5 (emphasis added). Not only does this allow prison officials to deny visitation based solely on a "reasonable belief" that the visit would jeopardize safety or security, but also it does not even state that such a reasonable belief is the only valid reason to deny a visit.

None of this is to say that there should not be such a right of visitation or communication. My task here is not a normative one to expound on why I might think prisoners and family members should have a constitutional right to visitation or telephonic communication. My role is limited to deciding if a court of competent clearly-established-law-declaring authority (*i.e.*, the Supreme Court, the Second Circuit, or other federal courts of appeals) has recognized such a right. Because the Second Circuit has made clear that district judges are powerless to declare law that "counts" for clearly-established-law purposes, *see Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006), there is no point in my embarking on an academic exercise in advisory opinion writing to say what I think the law is or should be. *See, e.g., Lawson v. Hilderbrand*, 2016 WL 3039710, at *3 (D. Conn. 2016) (discussing reasons why federal appeals courts may wish to resolve constitutional questions *de novo* in light of the limits on federal trial courts to articulate clearly established law for qualified immunity purposes).

What I can say is that there is no clearly established constitutional right of a prisoner or the prisoner's spouse against the suspension by prison officials of in-person visitation or

telephone communications for a period of as long as eight months. Accordingly, all defendants are entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. #77) is GRANTED on the ground that defendants have qualified immunity from plaintiffs' claims for money damages. Plaintiffs' motion for sanctions (Doc. #72) is DENIED as moot in light of the Court's grant of summary judgment. The Court is grateful to *pro bono* counsel Damian K. Gunningsmith and John Louis Cordani, Jr., of the law firm of Carmody Torrance Sandak & Hennessey LLP for the excellent quality of their briefing and representation of plaintiffs in this case.

It is so ordered.

Dated at New Haven this 22nd day of January 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge